## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| THE STATE OF MICHIGAN, | Case No. 2:25-cv-11215-JJCG-KGA |
| *Plaintiff,* | |
| *v.* | Hon. Jonathan J.C. Grey |
| EXPRESS SCRIPTS, INC.; EVERNORTH HEALTH, INC., formerly known as Express Scripts Holding Company; and PRIME THERAPEUTICS LLC, | Hon. Kimberly G. Altman |
| *Defendants.* | |

## <u>THE STATE OF MICHIGAN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. BACKGROUND ........................................................................................................3

   A.  The PBM Industry ..............................................................................................3

    B.  The Prime-ESI Agreement ................................................................................5

   C.  Effects in the State of Michigan ........................................................................6

III. LEGAL STANDARD ...............................................................................................7

IV. ARGUMENT .............................................................................................................7

   A.  Consideration of the Subcontract Agreement Is Improper ......................7

   B.  The State Has Plausibly Alleged an Antitrust Violation .........................10

    1.  The Prime-ESI Agreement constitutes concerted action. ...................12

    2.  Defendants' conduct is per se unlawful. ...............................................13

     a.  Prime and ESI are horizontal competitors. .........................................13

     b.  Any vertical elements to Prime and ESI's relationship are a product of their unlawful agreement or are outside the realm of the State's antitrust allegations................................................................................14

     c.  The ancillary restraints doctrine does not apply.............................16

    3.  In the alternative, Defendants' conduct is unlawful under the rule of reason.....................................................................................................18

     a.  A market definition is unnecessary because the State alleges anticompetitive effects through direct evidence. ...............................18

b.   The State has plausibly alleged market power in a relevant market ..................................................................................20

c.   *Ohio v. Amex* does not apply.............................................23

C.   **The State Has Plausibly Alleged Parens Patriae Standing to Bring Its Antitrust Claims**..................................................................25

1.   The State has asserted a quasi-sovereign interest...............25

2.   The State alleges a causal connection between the Agreement and harms to Michigan pharmacies and consumers. ..................29

3.   Federal antitrust law authorizes states to pursue parens patriae actions for injunctive relief. ...........................................30

4.   Michigan law authorizes the State to pursue damages for violations of the antitrust laws as parens patriae.......................................30

D.   **The State Has Plausibly Alleged Antitrust Standing.**..............32

E.   **The State Has Plausibly Alleged a Common Law Public Nuisance.** .......36

F.   **The State Has Plausibly Alleged a Statutory Public Nuisance.** ..............38

G.   **The State Has Plausibly Alleged Unjust Enrichment.**............................39

H.   **The State's Claims Are Timely.**.................................................40

1.   Each reimbursement made pursuant to the Agreement constitutes an overt act sufficient to continue the statute of limitations.....................41

2.   The State plausibly alleges fraudulent concealment. ..........42

I.   **Evernorth Is a Proper Defendant.**..............................................45

**V. CONCLUSION** ............................................................................45

iii

# TABLE OF AUTHORITIES

## Cases

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*,
    155 F.4th 795, 814-815 ................................................................................34

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982) .............................................................................25, 28

*AHF v. Prime*,
    No. 01-22-0000-2756 (Am. Arb. Ass'n Jan. 17, 2025) ................................2

*Am. Tobacco Co. v. United States*,
    328 U.S. 781 (1946) ......................................................................................9

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019) ....................................................................................23

*Arizona v. Maricopa Cnty. Med. Soc.*,
    457 U.S. 332 (1982) ....................................................................................11

*Assoc. Gen. Contractors of Cal. v. Cal. State Counc. of Carpenters*,
    459 U.S. 519 (1983) ....................................................................................32

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994) ..........................................................................33

*Barnosky Oils v. Union Oil*,
    665 F.2d 74 (6th Cir. 1981) .........................................................................41

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................10

*Belle Isle Grill v. Detroit*,
    256 Mich. App. 463 (2003) ...................................................................39, 40

*Bodie-Rickett v. Mar*,
    957 F.2d 287 (6th Cir. 1992) .......................................................................34

*Borozny v. Raytheon Techs.*,
No. 21-cv-1657, 2023 WL 348323 (D. Conn. 2023) ..........................................16

*Brave Optical v. Luxottica*,
No. 23-cv-793, 2025 WL 962827 (S.D. Oh. Mar. 31, 2025) ......................41, 42

*Broadcast Music v. Columbia Broadcasting Sys.*,
441 U.S. 1 (1979) ................................................................................................16

*Brown Shoe v. United States*,
370 U.S. 294 (1962) ............................................................................................21

*Cascade Elec. Co. v. Rice*,
70 Mich. App. 420 (1976)...................................................................................39

*Chapman v. Tristar Prods.*,
940 F.3d 299 (6th Cir. 2019)........................................................................27, 28

*Cloverleaf Car Co. v. Phillips Petroleum*,
213 Mich. App. 186 (1995).................................................................................36

*Connecticut v. Sandoz, Inc.*,
No. 20-cv-00802, 2025 WL 3043397 (D. Conn. Oct. 31, 2025) .................42

*Davis v. BetMGM, LLC*,
2025 WL 2054575 (Mich. July 22, 2025)...........................................................32

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
523 F.2d 389 (6th Cir. 1975)..............................................................................42

*DiBenedetto v. W. Shore Hosp.*,
461 Mich. 394 (2000)..........................................................................................38

*Duncan v. Leeds*,
742 F.2d 989 (6th Cir. 1984)..............................................................................44

*DXS v. Siemens Med. Sys.*,
100 F.3d 462 (6th Cir. 1996)........................................................................41, 42

*Edmonson v. Eagle Nat'l Bank*,
    922 F.3d 535 (4th Cir. 2019)..................................................................................44

*Erie Cnty. v. Morton Salt*,
    702 F.3d 860 (6th Cir. 2012)..............................................................................7, 10

*Foundation for Interior Design v. Savannah Coll.*,
    244 F.3d 521 (6th Cir. 2001)................................................................................18

*Ford v. Blue Cross Blue Shield*,
    No. 23-cv-11286, 2024 WL 1396264 ..................................................................20

*Francis v. Gen. Motors*,
    504 F. Supp. 3d 659 (E.D. Mich. 2020)..............................................................40

*FTC v. Mylan*,
    62 F. Supp. 2d 25 (D.D.C. 1999) ........................................................................31

*FTC v. Mylan*,
    99 F. Supp. 2d 1 (D.D.C. 1999) ..........................................................................31

*FTC v. Tenet Health Care*,
    186 F.3d 1045 (8th Cir. 1999)..............................................................................22

*GEICO v. Autoliv*,
    345 F. Supp. 3d 799 (E.D. Mich. 2018)..........................................................34, 35

*Georgia v. Penn. Railroad*,
    324 U.S. 439 (1945) ............................................................................................25

*Hadid v. Hartman*,
    No. 205799, 1999 WL 33453817 (Mich. Ct. App. 1999) ..................................37

*In re Auto. Parts Antitrust Litig.*,
    No. 12-md-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013) .....................44

*In re Auto. Parts Antitrust Litig.*,
    29 F. Supp. 3d 982 (E.D. Mich. 2014).................................................................29

*In re Auto. Parts Antitrust Litig.*,
  No. 13-cv-2005, 2021 WL 148004 (E.D. Mich. Jan. 15, 2021)........................28

*In re Cardizem Antitrust*,
  218 F.R.D. 508 (E.D. Mich. 2003)...................................................31

*In re Cardizem CD Antitrust Litig.*,
  105 F. Supp. 2d 618 (E.D. Mich. 2000)............................................29

*In re Cardizem Antitrust*,
  332 F.3d 896 (6th Cir. 2003)........................................................35

*In re Certified Question from U.S. Dist. Ct. for E. Dist. of Michigan*,
  465 Mich. 537 (2002)..................................................................30

*In re Delta Dental Antitrust Litig.*,
  484 F. Supp. 3d 627 (N.D. Ill. 2020) ...............................21, 22, 24, 25

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004) ...................................................39

*In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)................................................15

*In re Lorazepam Antitrust Litig.*,
  205 F.R.D. 369 (D.D.C. 2002)........................................................31

*In re MultiPlan Health Ins. Provider Litig.*,
  789 F. Supp. 3d 614 (N.D. Ill. 2025) ..............................................13

*In re NCAA Grant-In-Aid Cap Antitrust Litig.*,
  No. 14-md-02541, 2018 WL 4241981 (N.D. Cal. 2018)................................24

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010)............................................41

*In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*,
  No. 18-cv-00825, 2019 WL 5386484 (W.D. Ky. 2019).......................20, 43, 45

*In re Polyurethane Foam Antitrust Litig.*,
   152 F. Supp. 3d 968 (N.D. Oh. 2015) ........................................................42, 43

*In re RealPage Rental Software Antitrust Litig. (No. II)*,
   709 F. Supp. 3d 478 (M.D. Tenn. 2023) ...............................................20, 23, 25

*In re Southeastern Milk Antitrust Litig.*, (SE Milk)
   739 F.3d 262 (6th Cir. 2014).........................................................................16

*In re Theos Dark Chocolate Litig.*,
   750 F. Supp. 3d 1069 (N.D. Cal. 2024) ...........................................................8

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009).........................................................................41

*Innov. Ventures v. Custom Nutrition*,
   912 F.3d 316 (6th Cir. 2018)..........................................................................17

*Jefferson Parish Hosp. Dist. No. 2. v. Hyde*,
   466 U.S. 2 (1984) ...........................................................................................20

*Jodway v. Orlans*,
   759 F. App'x 374 (6th Cir. 2018) ...................................................................41

*Khoja v. Orexigen Therapeutics*,
   899 F.3d 988 (9th Cir. 2018)............................................................................8

*Klehr v. A.O. Smith*,
   521 U.S. 179 (1997) ..................................................................................41, 42

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998).......................................................................14

*Lie v. St. Joseph Hosp. of Mount Clemens*, (St. Joseph)
   964 F.2d 567 (6th Cir. 1992)...........................................................................19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................29

*Maryland v. Louisiana*,
451 U.S. 725 (1981) ..................................................................................................28

*Mayor of Detroit v. Arms Tech.*,
258 Mich. App. 48 (2003)..........................................................................................37

*Mediacom Se. LLC v. BellSouth Telecomm.*,
672 F.3d 396 (6th Cir. 2012).......................................................................................8

*Med. Ctr. at Elizabeth Pl. v. Atrium Health*, (Atrium Health)
922 F.3d 713 (6th Cir. 2019)......................................................................................17

*Mid-Michigan Radiology Assocs. v. Cent. Michigan Cmty. Hosp.*,
No. 94-cv-10057, 1995 WL 239360 (E.D. Mich. Feb. 14, 1995)......................33

*Missouri ex rel. Koster v. Harris*,
847 F.3d 646 (9th Cir. 2017)......................................................................................28

*Moyer v. Gov't Emps. Ins.*,
114 F.4th 563 (6th Cir. 2024)......................................................................................2

*New York v. Facebook*,
549 F. Supp. 3d 6 (D.D.C. 2021) ...............................................................................27

*New York v. Microsoft*, (Microsoft)
209 F. Supp. 2d 132 (D.D.C. 2002) ...................................................................28, 30

*NHL Players Ass'n v. Plymouth Whalers*,
419 F.3d 462 (6th Cir. 2005)......................................................................................11

*Ogden v. Little Caeser Enters.*,
393 F. Supp. 3d 622 (E.D. Mich. 2019)....................................................................17

*Ohio v. Amex*, (Amex)
585 U.S. 529 (2018) .............................................................................................19, 23

*Omnicare v. Unitedhealth Grp.*,
524 F. Supp. 2d 1031 (N.D. Ill. 2007) .......................................................................3

*Osterhaus Pharmacy v. Express Scripts*,
  768 F. Supp. 3d 1186 (W.D. Wash. 2025)............................................................1

*Palmer v. BRG of Georgia*,
  498 U.S. 46 (1990) ..............................................................................................15

*Palmer v. BRG*,
  874 F.2d 1417 (11th Cir. 1989)..........................................................................15

*Pennsylvania v. New Jersey*,
  426 U.S. 660 (1976) ............................................................................................25

*People v. Monaco*,
  474 Mich. 48 (2006)............................................................................................38

*Perceptron v. Sensor Adaptive Machs., Inc.*,
  221 F.3d 913 (6th Cir. 2000)..............................................................................10

*Phhhoto v. Meta*,
  123 F.4th 592 (2d Cir. 2024)..............................................................................44

*Pinney Dock v. Penn Cent.*,
  838 F.2d 1445 (6th Cir. 1988)............................................................................43

*PLS.com v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022)...............................................................................19

*Realcomp II v. FTC*,
  635 F.3d 815 (6th Cir. 2011)..............................................................................19

*Roxul v. Armstrong World Indus.*,
  No. 17-cv-1258, 2018 WL 810143 (D. Del. 2018)......................................11, 18

*Ruth v. Unifund*,
  604 F.3d 908 (6th Cir. 2010)..............................................................................45

*Southaven Land Co. v. Malone & Hyde*,
  715 F.2d 1079 (6th Cir. 1983)............................................................................33

x

*State ex rel. Oakland Prosecuting Attorney v. Ginell*,
　407 N.W.2d 59 (Mich. Ct. App. 1987) ...............................................................38

*State v. Detroit Lumbermen's Ass'n*, (Lumbermen)
　No. 79-904761, 1979 WL 18703 (Mich. Cir. Ct. Oct. 29, 1979).............3, 30, 32

*State v. McQueen*,
　811 N.W.2d 513 (2011) ....................................................................................37

*Static Control Components v. Lexmark*,
　697 F.3d 387 (6th Cir. 2012)............................................................................34

*Sun Microsys. v. Hynix*,
　622 F. Supp. 2d 890 (N.D. Cal. 2009) .............................................................45

*Texaco v. Dagher*,
　547 U.S. 1 (2006) ......................................................................................16, 17

*Tkachik v. Mandeville*,
　487 Mich. 38 (2010)........................................................................................39

*Toys 'R' Us v. FTC*,
　221 F.3d 928 (7th Cir. 2000)............................................................................23

*United States v. Bertelsmann*,
　646 F. Supp. 3d 1 (D.D.C. 2022) .....................................................................21

*United States v. Koppers*,
　652 F.2d 290 (2d Cir. 1981).............................................................................16

*United States v. Live Nation Ent.*,
　No. 24-cv-3973, 2025 WL 835961 (S.D.N.Y. 2025)...................................33, 35

*United States v. Socony-Vacuum Oil Co.*,
　310 U.S. 150 (1940) ........................................................................................13

*United States v. Topco Assocs., Inc.*,
　405 U.S. 596 (1972) ........................................................................................13

*Valley Liquors v. Renfield Importers*,
    822 F.2d 656 (7th Cir. 1987).................................................................23

*Valley Prods. v. Landmark*,
    128 F.3d 398 (6th Cir. 1997).................................................................32

*Vogel v. Am. Soc. of Appraisers*,
    744 F.2d 598 (7th Cir. 1984).................................................................13

*W. Penn Allegheny Health Sys. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)....................................................................34

*Wausau Underwriters v. Vulcan*,
    No. 00-cv-70879, 2001 WL 34089607 (E.D. Mich. Apr. 16, 2001).................40

*Z Techs. v. Lubrizol*,
    753 F.3d 594 (6th Cir. 2014).................................................................41

## Statutes

Clayton Antitrust Act, 15 U.S.C. §§ 15c, 26.....................................................30, 31

M.C.L. § 14.28 .................................................................................................30, 31

M.C.L. § 445.771 ....................................................................................................31

M.C.L. § 445.784(2)................................................................................................10

M.C.L. § 550.827 ....................................................................................................27

M.C.L. § 600.3801 ..................................................................................................38

M.C.L. § 600.3801(1)..............................................................................................39

M.C.L. § 600.3801(3)..............................................................................................38

Sherman Antitrust Act, 15 U.S.C. § 1 .....................................................................10

## **<u>Secondary Sources</u>**

Areeda & Hovenkamp, *Antitrust Law* ¶ 350b (Supp. 2024) ...................................34

**CONCISE STATEMENT OF ISSUES PRESENTED**

1. Whether the Court may consider the "Subcontract Agreement" Defendants attach to their motion under the "incorporation-by-reference" doctrine.

   **The State's Answer:** NO.

2. Whether the State plausibly alleges Defendants have engaged in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Michigan Antitrust Reform Act, M.C.L. § 445.772.

   **The State's Answer:** YES.

3. Whether the State plausibly alleges a quasi-sovereign interest in the outcome of this Action sufficient to establish parens patriae standing.

   **The State's Answer:** YES.

4. Whether the State has parens patriae authority to pursue injunctive relief for antitrust violations under federal law.

   **The State's Answer:** YES.

5. Whether the State has parens patriae authority to pursue damages for antitrust violations under Michigan state law.

   **The State's Answer:** YES.

6. Whether the State plausibly alleges it has antitrust standing to seek damages suffered by Michigan pharmacies as result of Defendants' alleged misconduct.

   **The State's Answer:** YES.

7. Whether the State plausibly alleges public nuisance claims under Michigan common law and M.C.L. § 600.3801(3).

**The State's Answer:** YES.

8. Whether the State plausibly alleges a claim for unjust enrichment.

   **The State's Answer:** YES.

9. Whether the State's claims are timely under the continuing violation doctrine and whether the State plausibly alleges fraudulent concealment.

   **The State's Answer:** YES.

10. Whether the State plausibly alleges Evernorth Health, Inc. is a proper party.

   **The State's Answer:** YES.

## **CONTROLLING OR MOST APPROPRIATE AUTHORITIES**

**Statutes:**

1. Sherman Antitrust Act, 15 U.S.C. § 1
2. Clayton Antitrust Act, 15 U.S.C. § 26
3. Revised Statutes of 1846, Mich. Comp. Laws § 14.28
4. Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771 et seq.
5. Revised Judicature Act of 1961, Mich. Comp. Laws § 600.3801

**Cases:**

1. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982)
2. *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332 (1982)
3. *Belle Isle Grill v. Detroit*, 256 Mich. App. 463 (2003)
4. *Cloverleaf Car Co. v. Phillips Petroleum*, 213 Mich. App. 186 (1995)
5. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975)
6. *GEICO v. Autoliv*, 345 F. Supp. 3d 799, 822 (E.D. Mich. 2018)
7. *Klehr v. A.O. Smith*, 521 U.S. 179 (1997)
8. *Moyer v. Gov't Emps. Ins.*, 114 F.4th 563 (6th Cir. 2024)
9. *Osterhaus Pharmacy v. Express Scripts*, 768 F. Supp. 3d 1186 (W.D. Wash. 2025)
10. *State v. Detroit Lumbermen's Ass'n*, 1979 WL 18703 (Mich. Cir. Ct. Oct. 29, 1979)

## I.      <u>INTRODUCTION</u>

This case addresses a matter of critical importance to the health and economic welfare of the people of Michigan. Defendants Express Scripts, Inc. ("ESI"), Evernorth Health, Inc. ("Evernorth"), and Prime Therapeutics LLC ("Prime") are rival pharmacy benefit managers ("PBMs"), which operate within the State of Michigan. Am. Compl. ("AC") ¶¶ 25–29, ECF No. 1. The Michigan Attorney General, acting as parens patriae on behalf of the people (the "State"), alleges that Defendants entered into a horizontal agreement to fix and suppress the reimbursement rates paid to Michigan pharmacies for dispensing prescription drugs (the "Prime-ESI Agreement" or "Agreement"). *Id.* ¶¶ 2, 88–90. This Agreement has driven reimbursement rates below competitive—and, in some instances, even sustainable—levels, causing significant financial distress for Michigan pharmacies and contributing to pharmacy closures across the state. *Id.* ¶¶ 91–93, 112, 122–23. The State brings claims under federal and state antitrust laws, as well as claims for public nuisance and unjust enrichment. *Id.* ¶¶ 30, 164–206.

Virtually identical price-fixing allegations to those asserted by the State here have already withstood scrutiny in two separate proceedings involving Defendants: a proposed antitrust class action targeting the Prime-ESI Agreement that recently survived a motion to dismiss in the Western District of Washington, *Osterhaus Pharmacy v. Express Scripts*, 768 F. Supp. 3d 1186, 1197-98 (W.D. Wash. 2025),

and a price-fixing suit brought by the AIDS Health Foundation ("AHF") against Prime, which recently resulted in a final judgment in AHF's favor of $10 million from the American Arbitration Association, *AHF v. Prime*, No. 01-22-0000-2756, Interim Award on the Merits (Am. Arb. Ass'n Jan. 17, 2025) (Widman, Arb.).

Perhaps recognizing the strength of the State's allegations, Defendants do not bother to address them head on and instead resort to gimmicks. After filing a motion to stay even limited discovery into the Prime-ESI Agreement, ECF No. 25, Defendants attach a ▮▮▮▮▮ "Subcontract Agreement" to their Motion, which they claim undermines the State's allegations of horizontal price fixing. That document— which does not include the full set of documents governing the alleged conspiracy— cannot be considered on a motion to dismiss. *Moyer v. Gov't Emps. Ins.*, 114 F.4th 563, 568 (6th Cir. 2024).[1] Even if it could, the document only confirms the State's allegations here: As Defendants admit, per this "subcontract," Prime's reimbursements to pharmacies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. at 7 (emphasis added). This admission corroborates the well-pled allegations in the Complaint, including that Defendants "created a buyers' cartel to suppress the prices

---

[1]The State declines to address the Subcontract Agreement here (other than to rebut specific contentions made by Defendants in their Motion). The State will seek leave to file a sur-reply to address the Subcontract Agreement in full if this Court wishes to consider the document in ruling on Defendants' Motion.

they pay for retail pharmacy dispensing services." AC ¶ 88.

Defendants' standing arguments fare no better. It is well established that the State has parens patriae standing to bring claims for damages under state antitrust law. *State v. Detroit Lumbermen's Ass'n*, No. 79-904761, 1979 WL 18703, at *5-6 (Mich. Cir. Ct. Oct. 29, 1979). And the State has asserted antitrust standing by alleging, among other harms, that Michigan pharmacies have suffered under-payment injuries as a direct result of Defendants' buyers' cartel. AC ¶¶ 88, 100. *See Omnicare v. Unitedhealth Grp.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007).

The State also adequately pleads claims for public nuisance and unjust enrichment. It alleges Defendants' suppression of reimbursement rates has contributed to pharmacy closures, significantly interfering with the public's right to health and safety, AC ¶¶ 185–87, 191-92. And the State alleges Defendants have been unjustly enriched by their scheme. *Id.* ¶¶ 203–05.

Defendants' Motion to dismiss the Complaint should be denied in its entirety.

## II.    BACKGROUND

### A.    The PBM Industry

Over 80% of U.S. prescription drug expenditures are made by third-party payors ("TPPs"), e.g., commercial insurers, public programs like Medicaid and Medicare, and large employers who sponsor health plans with prescription drug benefits. AC ¶ 143. To administer prescription drug benefits to plan members, TPPs

3

hire pharmacy benefits managers ("PBMs"). *Id.* ¶ 3. PBMs negotiate the prices TPPs pay pharmacies for prescription drugs, administer payments to pharmacies, design plan benefits, and create networks of pharmacies where TPP plan members (whom PBMs call "covered lives") can use insurance to fill prescriptions. *Id.* ¶ 4.

Pharmacies must generally participate in a PBM's "network" to do business with its covered lives. *Id.* ¶ 7. To join a PBM's network, pharmacies enter into contracts that dictate reimbursement rates, fees, and other conditions. *Id.* ¶¶ 7, 66. Because most individuals rely on insurance benefits to access medications, pharmacies must participate in the networks of large PBMs to remain viable. *Id.* ¶¶ 8, 78. PBMs also depend on pharmacies: a PBM with a weak network cannot attract TPP clients because health plans demand broad, convenient pharmacy access for their members. *Id.* ¶ 11. PBMs therefore compete for pharmacies by offering higher reimbursement rates and lower fees. *Id.* Larger PBMs—which can promise pharmacies more business—generally command greater pricing discounts, i.e. they offer lower reimbursements to pharmacies, and charge higher network participation fees. *Id.* ¶ 12. Smaller PBMs, by contrast, must pay higher rates and charge lower fees to persuade pharmacies to join their networks. *Id.*

The more insureds a PBM represents, the greater its leverage in negotiations with pharmacies. *Id.* ¶ 10. Large PBMs exploit their market power to impose lopsided contractual terms on pharmacies and suppress reimbursement rates. *Id.* ¶ 8.

They may impose back-end fees on pharmacies—such as direct and indirect remuneration ("DIR") fees—that reduce reimbursement after the point of sale. *Id.* ¶ 63. In addition, many PBMs engage in "spread" pricing, retaining, often as profit, the difference between the amount paid to pharmacies and the higher amount charged to health plans. *Id.* ¶ 61.

Today, the three largest PBMs—ESI, Caremark, and OptumRx—process nearly 80% of all prescription drug claims nationwide and manage benefits for roughly 270 million insureds. *Id.* ¶¶ 5, 71. ESI alone controls about 23% of the national PBM services market, while Prime controls about 3%. *Id.* ¶¶ 10, 72. Pharmacies must accept the terms imposed by the dominant PBMs or lose access to most insured customers. *Id.* ¶ 8. These PBMs are also vertically integrated with pharmacies, giving them strong incentives to steer patients to affiliated outlets (even when independent competitors provide better services or lower prices) and to push independent pharmacies out of business. *Id.* ¶¶ 6, 75–77. Because PBM-owned pharmacies operate largely through mail order, vertical integration creates powerful incentives for PBMs to eliminate retail pharmacies altogether. *Id.* ¶¶ 83–86.

**B.    The Prime-ESI Agreement**

Starting in late 2019 and continuing to the present, ESI and Prime—rival PBMs that operate in Michigan—agreed to provide the same reimbursement rates and to charge the same fees to pharmacies (the "Agreement"). AC ¶ 89. Prior to the

5

Agreement, Prime competed with ESI for pharmacy dispensing services. As the smaller PBM with less purchasing power, Prime generally paid pharmacies about 20% more than ESI. *Id.* ¶ 91. Prime also extracted lesser network fees from pharmacies than ESI. *Id.* ¶ 99. In exchange for access to ESI's network rates and buying power, Prime agreed to pay ESI administrative fees on each transaction, enabling both PBMs to profit by suppressing pharmacy compensation. *Id.* ¶¶ 14, 96.

Since the Prime-ESI Agreement took effect, Prime's reimbursement claims have been automatically processed under ESI's negotiated rates. *Id.* ¶ 102. Compensation on Prime transactions is now more than 20% lower than before the Agreement, even though Prime's network has remained virtually unchanged. *Id.* ¶¶ 103–104. Prime has reported at least $2.5 billion in savings from the Agreement—profits realized at the expense of pharmacies. *Id.* ¶ 105. The Agreement increased ESI's buying power: By adding Prime's 30 million members to its existing 75 million, ESI began negotiating with pharmacies on behalf of more than 100 million members. *Id.* ¶¶ 15, 108. This scale has allowed ESI to extract concessions from pharmacies that would not be possible in a competitive market. *Id.* ¶¶ 15, 108.

### C.    Effects in the State of Michigan

As a result of the Agreement, Defendants have paid below-market compensation amounts to Michigan pharmacies for prescription-drug dispensing services. AC ¶ 100. In some instances, compensation rates for particular drugs are

lower than a pharmacy's acquisition costs. *Id.* ¶ 112. With ESI controlling as much as 89% of the State's PBM Services Market, pharmacies have no realistic choice but to accept these below-market rates. *Id.* ¶¶ 16, 109–110. Suppressed reimbursement rates have left many pharmacies unable to sustain their businesses. *Id.* ¶ 112. Between January and August 2024, 272 pharmacies shuttered in Michigan, including 91 independents. *Id.* ¶ 122. These closures disproportionately struck low-income and medically underserved communities, leaving half of Detroit neighborhoods and more than 40 northern towns as pharmacy deserts. *Id.* ¶¶ 20, 124–25. Patients in these areas must now travel long distances to fill prescriptions, reducing medication adherence and worsening health outcomes. *Id.* ¶¶ 20, 125–126.

## III.   LEGAL STANDARD

On a motion to dismiss, a court must "construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true." *Erie Cnty. v. Morton Salt*, 702 F.3d 860, 867 (6th Cir. 2012). A complaint will be sustained if it alleges "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (cleaned up).

## IV.   ARGUMENT

### A.   Consideration of the Subcontract Agreement Is Improper

On a motion to dismiss, "[a] district court is not permitted to consider matters beyond the complaint" unless the motion is converted to one for summary judgment.

7

*Mediacom Se. LLC v. BellSouth Telecomm.*, 672 F.3d 396, 399 (6th Cir. 2012). One limited exception to this rule is the "incorporation-by-reference" doctrine, which allows a court to consider materials outside of the complaint if they were "referred to in the pleadings" and are "integral to the claims." *Moyer*, 114 F.4th at 568. The doctrine exists "to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken" them. *In re Theos Dark Chocolate Litig.*, 750 F. Supp. 3d 1069, 1080 (N.D. Cal. 2024).

The incorporation-by-reference doctrine must be applied narrowly to avoid unfairness to plaintiffs. *See Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 999 (9th Cir. 2018) ("If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief."). Courts exercise caution where "the defendants possess materials to which the plaintiffs do not yet have access." *Id.* at 998-99 (noting "consideration of extrinsic evidence at the motion to dismiss stage" is "particularly troubling in the common situation of asymmetry, where a defendant starts off with sole possession of the information about the alleged wrongdoing") (citation omitted). And courts do not apply the doctrine if there are "legitimate questions about whether the defendant has provided a complete set of governing documents." *Moyer*, 114 F.4th at 568 (declining to consider document

8

because defendant did not "provide[] a full set").

The basic prerequisites for incorporation do not exist here. The Complaint never explicitly references the Subcontract Agreement. Rather, it alleges a multifaceted *conspiracy* between Prime and ESI to fix prices (the "Prime-ESI Agreement"), which may not have been reduced entirely to writing. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) ("No formal agreement is necessary to constitute an unlawful conspiracy."). Nor has the State "cherry-picked" portions of the Subcontract Agreement to support its position, while omitting contradictory sections. *Theos*, 750 F. Supp. 3d at 1080. Indeed, it could not have done so, because it did not have access to the document when drafting the Complaint.[2]

Even assuming the alleged price-fixing conspiracy was entirely reduced to writing, the Subcontract Agreement would not comprise the complete set of documents governing that conspiracy, which likewise precludes incorporation. *Moyer*, 114 F.4th at 568. The State alleges, for example, that Defendants' conspiracy involves the exchange of competitively sensitive information "through a secretive, offshore, jointly owned group purchasing organization ('GPO') called 'Ascent.'" AC ¶ 101. █████████████████████████████████████████████

---

[2] Nor did the State rely on or reference the Subcontract Agreement in its single-sentence amendment in October 2025.

███████████████████████████████

Defendants' conduct in this litigation also confirms that other governing documents exist. After filing its original Complaint, the State served a single request for the production of all "written Agreement(s) [among Defendants] . . . effectuating or relating to the Prime-ESI Agreement." ECF No. 31-3. In response, Defendants sought to stay discovery pending resolution of the motion to dismiss on the basis of burden. ECF No. 25 at 10-13. But if the Subcontract Agreement were the only document responsive to the request, complying with it would impose no burden at all. Defendants cannot refuse to engage in such discovery while at the same time attempting to incorporate a single contract into the Complaint. Legitimate questions exist about whether Defendants have provided a complete set of records governing the conspiracy, so further discovery is needed. *Moyer*, 114 F.4th at 565-67.

### B.   The State Has Plausibly Alleged an Antitrust Violation

To state a claim for a violation of Section 1 of the Sherman Act,[3] a complaint must provide "plausible grounds to infer an agreement," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).[4] Such agreement may be found when "the conspirators

---

[3] The parties agree that the Michigan Antitrust Reform Act follows federal law on interpreting the illegality of price-fixing agreements. *See* M.C.L. § 445.784(2); *Perceptron v. Sensor Adaptive Machs., Inc.*, 221 F.3d 913, 919 n.6 (6th Cir. 2000).

[4] Plausibility does not mean probability, and on a motion to dismiss, a plaintiff is "not required to allege facts showing that an unlawful agreement is more likely than lawful parallel conduct." *Erie Cnty.*, 702 F.3d at 868. Nor does a plaintiff need to allege facts that "tend[] to exclude the possibility of lawful, independent conduct."

had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco*, 328 U.S. at 810. A plaintiff must also plausibly allege the defendants' conduct unreasonably restrains trade. *NHL Players Ass'n v. Plymouth Whalers*, 419 F.3d 462, 469 (6th Cir. 2005). Courts evaluate "reasonableness" by either treating the defendants' conduct as per se unlawful, or by applying the "rule of reason," which weighs the conduct's anticompetitive effects against its potential pro-competitive benefits. *See Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 343 (1982). Price-fixing among competitors is per se unlawful, *id.* 344–45, so the rule of reason does not apply here. But regardless of which test applies, the pleading standard is very similar because the rule of reason involves weighing inherently factual issues not appropriate for review on a Rule 12 motion. *See Roxul v. Armstrong World Indus.*, No. 17-cv-1258, 2018 WL 810143, at *6 (D. Del. Feb. 9, 2018).

The State alleges Defendants Prime and ESI—rival PBMs that buy goods and services from pharmacies on behalf of TPPs—entered into an agreement to fix and suppress reimbursement rates (the "Prime-ESI Agreement"). AC ¶¶ 88–100. When buyers agree to fix and suppress prices, it is per se unlawful—regardless of the myriad ways Prime and ESI try to recast their arrangement. *See Maricopa Cnty.*, 457

---

*Id.* at 869 (cleaned up). Thus, a complaint may survive a motion to dismiss "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote or unlikely.'" *Twombly*, 550 U.S. at 556.

U.S. at 344–45. Rather than address the State's allegations head on, Defendants raise a number of ancillary arguments—almost all of which raise fact-intensive issues that are inappropriate for resolution on a motion to dismiss.

### 1.  The Prime-ESI Agreement constitutes concerted action.

Defendants do not seem to challenge that they engaged in "concerted action"—i.e., that they entered into an agreement concerning pharmacy reimbursement rates. They even admit that, under their Subcontract Agreement, Prime's reimbursements to pharmacies ███████████████████████████ ████████████████████████████████████████████████████████████ ██████████ This admission corroborates the well-pled allegations in the Complaint that Prime and ESI have "created a buyers' cartel to suppress the prices they pay for retail pharmacy dispensing services," AC ¶ 88; "agreed to provide the same reimbursement rates and impose the same fees on pharmacies," *id.* ¶ 89; "eliminated price competition between ESI and Prime for pharmacy services," *id.* ¶ 93; and that "Prime was prohibited from deviating from [agreed-upon pricing] 'guardrails' or going below ESI's pricing for [pharmacies] in each of Prime's pharmacy networks." *Id.* ¶ 97. In *Osterhaus*, Judge Jones found Defendants' agreement to fix prices could be "plausibly infer[red]" from the same basic set of allegations. 768 F. Supp. 3d at 1196. Accordingly, the State plausibly alleges the first element of a Section 1 claim.

12

## 2.  Defendants' conduct is per se unlawful.

Some agreements are so inherently anticompetitive that they are considered unlawful "per se," meaning courts do not analyze their anticompetitive effects. *Maricopa Cnty.*, 457 U.S. at 344–45 ("Once a price-fixing agreement was proved, . . . there was a conclusive presumption which brought such agreements within the statute.") (cleaned up). Horizontal price-fixing—as alleged here—is the quintessential antitrust violation deserving of per se treatment. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). This is true even when the agreement is effectuated by buyers. *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("[B]uyer cartels, the object of which is to force the prices that suppliers charge the members of the cartel below the competitive level, are illegal per se.").

### a.  Prime and ESI are horizontal competitors.

The Prime-ESI Agreement constitutes horizontal price-fixing susceptible to evaluation under the per se standard because Prime and ESI would otherwise compete against each other at the same level of market—including for pharmacy dispensing services. AC ¶¶ 89, 130. *See In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614 (N.D. Ill. 2025) (plaintiffs plausibly alleged per se unlawful horizontal price-fixing conspiracy where insurers agreed to "stop competing against each other" on prices paid to medical providers).

13

The State also alleges that, in the absence of the Agreement, reimbursement rates to pharmacies would have been higher because Prime and ESI would have had to compete against each other on price to attract pharmacies to their networks. AC ¶ 11. Where there is a question about whether an agreement constitutes price-fixing, as opposed to some other restrictive conduct, courts consider whether it has "clear anticompetitive consequences." *Vogel*, 744 F.2d at 603. Direct price impacts—like the higher reimbursement rates the State alleges would have prevailed in a competitive market, AC ¶ 100—is the exact type of clear anticompetitive consequence the antitrust laws aim to protect against. *Maricopa Cnty.*, 457 U.S. at 348 (agreements that "are horizontal and fix maximum prices" are "on the same legal . . . footing as agreements to fix minimum or uniform prices"). By eliminating the element of price competition, the consequence of the Prime-ESI Agreement was to deprive pharmacies of the "normal fruits of their enterprises." *Law v. NCAA*, 134 F.3d 1010, 1022 (10th Cir. 1998).

> **b. Any vertical elements to Prime and ESI's relationship are a product of their unlawful agreement or are outside the realm of the State's antitrust allegations.**

In an effort to escape per se liability, Defendants argue that under the Subcontract Agreement, they were engaged in a vertical relationship in which Prime bought "network" services from ESI. Mot. at 31, 33.[5] But horizontal competitors

---

[5] They also claim it created a hybrid "dual-distribution" arrangement. Mot. at 34.

14

cannot escape antitrust liability simply by agreeing not to compete and casting their relationship as vertical. Mot. at 34. *Palmer v. BRG of Georgia*, 498 U.S. 46, 47 (1990), is instructive. There, two bar exam prep companies agreed that one would exclusively license its brand to the other and not compete with the licensee in the Georgia market, in exchange for a share of revenues. *Id.* at 47. While the defendants characterized this agreement as a vertical "licensing" arrangement, *see Palmer v. BRG*, 874 F.2d 1417, 1423 (11th Cir. 1989), the Supreme Court held that it was, in substance, a per se unlawful horizontal market allocation. 498 U.S. at 49.

The same is true here: The Prime-ESI Agreement, though styled as a vertical service contract, in substance eliminates competition between Prime and ESI in the relevant market. Rather than compete against ESI for pharmacy services by offering better compensation (as Prime had previously done), under the Agreement, Prime adopts ESI's network pricing and, in exchange, pays ESI transaction fees. AC ¶¶ 89–96. This effectuates a kind of revenue-sharing arrangement (as in *Palmer*), allowing both firms share in the supra-competitive profits generated by underpaying pharmacies. *See also In re Keurig Green Mtn. Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 244 (S.D.N.Y. 2019) (licensing agreement subject to per se treatment despite vertical elements because it eliminated competition in relevant market).

Even if Prime and ESI's relationship had legitimate vertical elements, per se treatment would still apply to their agreement to fix prices because it "could not have

15

had any effect except an anti-competitive one." *United States v. Koppers*, 652 F.2d 290, 297 (2d Cir. 1981) (applying per se standard to bid-rigging even though parties also had vertical purchaser-supplier relationship); *Borozny v. Raytheon Techs.*, No. 21-cv-1657, 2023 WL 348323, at *7 (D. Conn. Jan. 20, 2023) (applying per se standard to market allocation despite existence of "some potentially vertical elements of their relationship").

### c. The ancillary restraints doctrine does not apply.

Defendants cite cases decided under the "ancillary restraints doctrine," suggesting their conduct is protected as a lawful joint venture or similar cooperative arrangement. *See* Mot. at 31, 33.[6] But the ancillary restraints doctrine has no

---

[6] Defendants' cited cases are readily distinguishable. *Texaco v. Dagher* involved an agreement between rival oil companies to cease competing altogether and "pool their resources and share the risks of and profits from" a new "joint venture." 547 U.S. 1, 4 (2006). The Court functionally treated this arrangement as a merger to which the rule of reason applied. *See id.* at 6 n.1, 7-8 (holding that once competitors have consolidated their operations, the new merged entity is free to set prices, and such conduct does not constitute price fixing). No such consolidation exists here: As Defendants concede, Prime and ESI maintain a "horizontal relationship" and continue to compete in the PBM market. Mot. at 34. In *Southeastern Milk*, the restraint at issue was between parties at different levels of the market—a raw milk supplier and a downstream bottling company—which the Sixth Circuit treated as vertical. 739 F.3d 262, 273 (6th Cir. 2014). Here, the restraint is between horizontally oriented entities. In *Broadcast Music v. Columbia Broadcasting*, the Court held that an agreement among composers to market "blanket licenses" (which grant licensees access to music repositories in exchange for a subscription fee) was not per se unlawful because it created a "different product" than individual licenses. 441 U.S. 1, 23 (1979) (finding composers' agreement was "necessary to market the [new] product at all"). Here, Defendants' agreement is not necessary to market any new or "different product." *Id.* at 22. The other cited cases involved restraints that

16

applicability where, as here, the challenged conduct is wholly unrelated to any efficiency-enhancing purposes of otherwise lawful joint conduct. *See Med. Ctr. at Elizabeth Pl. v. Atrium Health*, 922 F.3d 713, 725 (6th Cir. 2019); *Osterhaus*, 768 F. Supp. 3d at 1197 (rejecting characterization of Prime-ESI Agreement as a lawful "purchasing cooperative[]").

The ancillary restraints doctrine requires application of the rule of reason to restraints that bear "a reasonable relationship" to a cooperative venture. *Atrium Health*, 922 F.3d at 725. Under the doctrine, courts assess whether the "challenged conduct" (or "restraint") reflects the "joint venture's efficiency-enhancing purposes" or instead is "nakedly unrelated to the purpose of the joint venture." *Id.* ("[A] joint venture's restraint is ancillary and therefore inappropriate for per se categorization when, viewed at the time it was adopted, the restraint 'may contribute to the success of a cooperative venture.'"). But horizontal pricing fixing, even in the context of lawful joint conduct, is still unlawful per se. *Id.*; *see also Dagher*, 547 U.S. at 5–6.

Agreeing on reimbursement rates is unrelated to any apparent lawful cooperation that may also have occurred between Defendants. Prime did not need to

---

are not subject to per se scrutiny. *Innov. Ventures v. Custom Nutrition*, 912 F.3d 316, 340–41 (6th Cir. 2018) ("restrictive covenants [that] do not fix prices or allocate territory"); and *Ogden v. Little Caeser Enters.*, 393 F. Supp. 3d 622, 634 (E.D. Mich. 2019) (no-poach clauses in franchise agreements). Defendants point to *no case* in which the rule of reason applied to agreements between horizontal competitors to fix prices, as the State alleges here.

17

adopt ESI's reimbursement rates to obtain "efficiency-enhancing benefits" in contracting with ESI for ███████████████████████████ ████████" Mot. at 31; *see Atrium Health*, 922 F.3d at 725. And Defendants do not even try to justify price coordination as related to any legitimate "efficiency enhancing" or pro-competitive purpose.[7] Accordingly, the ancillary restraints doctrine does not compel application of the rule of reason here.

### 3. In the alternative, Defendants' conduct is unlawful under the rule of reason.

Because the pleading standard is functionally the same whether per se treatment or the rule of reason applies, *see Roxul*, 2018 WL 810143, at *6, the State's allegations are also sufficient to state a Section 1 claim under the rule of reason.

### a. A market definition is unnecessary because the State alleges anticompetitive effects through direct evidence.

Defendants misleadingly quote *Foundation for Interior Design v. Savannah Coll.*, to argue that a "plaintiff must show that his defendant has market power in the relevant market." Mot. at 38 (244 F.3d 521, 530–31 (6th Cir. 2001) ("*Foundation*")). But they omit a crucial word from *Foundation*: "Generally." Properly quoted, *Foundation* states: "**Generally**, a plaintiff must show that his defendant has market

---

[7] The only justification Defendants put forward is that coordinating reimbursement rates allows Prime "to negotiate 'lower rates of compensation' with pharmacies" than it otherwise could. Mot. at 32. But increasing profits by underpaying suppliers does not justify price-fixing. *See Law*, 134 F.3d at 1023 ("[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws.").

power in the relevant market." (emphasis added). As the Sixth Circuit has explained, while the purpose of defining a relevant market is to determine "whether, or to what extent, market power exists," *SE Milk*, 739 F.3d at 277, that inquiry serves as a "surrogate" for anticompetitive effects. *Realcomp II v. FTC*, 635 F.3d 815, 827 (6th Cir. 2011). Instead, where a plaintiff has alleged direct evidence of market power— through proof of increased prices—defining a relevant market is unnecessary. *See Ohio v. Am. Express*, 585 U.S. 529, 542 (2018). On a motion to dismiss, a plaintiff need only allege facts demonstrating market power in a relevant market if the claim is analyzed under the rule of reason *and* is sought to be proven through indirect evidence. *See Lie v. St. Joseph Hosp. of Mount Clemens*, 964 F.2d 567, 569 (6th Cir. 1992) ("The Court does not demand this inquiry into market power in the presence of a naked restriction on price or output, and thus does not allow failure to prove market power to defeat a plaintiff's antitrust action in such a case.") (cleaned up); *PLS.com v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022) ("A plaintiff is not required to define a particular market for a *per se* claim.").

Here, the State does not require the "surrogate" of market power to show anticompetitive effects because it pleads direct evidence of harm to competition. Specifically, the State alleges that because of the Prime-ESI Agreement, Prime paid pharmacies 20% less. AC ¶ 138. Further development of relevant markets is therefore unnecessary. *See St. Joseph Hosp.*, 964 F.2d at 570 ("Proof of actual

19

detrimental effects can obviate the need to prove the defendant's market power.")

(cleaned up); *Ford v. Blue Cross Blue Shield*, No. 23-cv-11286, 2024 WL 1396264,

at *6 (E.D. Mich. Mar. 30, 2024) (plaintiff "pled market power despite not needing

to" because it pled per se unreasonable restraint); *In re Papa John's Emp. &*

*Franchisee Emp. Antitrust Litig.*, No. 18-cv-00825, 2019 WL 5386484 (W.D. Ky.

Oct. 21, 2019) (denying motion to dismiss where plaintiff alleged direct evidence of

adverse effects on competition without a market definition or market power).

### b. The State has plausibly alleged market power in a relevant market.

Even if proof of market power is needed here (and it is not), the State's

allegations regarding the relevant market are sufficient. Defining the contours of

relevant antitrust market is a "highly fact-based analysis that generally requires

discovery." *Foundation*, 244 F.3d at 531. Dismissal based on a market argument is

therefore rare and occurs only when the market allegations are "facially

unsustainable." *In re RealPage Rental Software Antitrust Litig. (No. II)*, 709 F. Supp.

3d 478, 521 (M.D. Tenn. 2023) (citations omitted). That is not the case here.[8]

***Market Definition.*** The State defines a relevant antitrust market as the input

market for Retail Pharmacy Dispensing Services for purchase by PBMs on behalf of

---

[8] *Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 27 (1984), which Defendants cite, was decided after a trial.

third-party payors. AC ¶ 103. These market allegations are plausible.[9]

In a buyer's cartel case, the relevant market "is comprised of buyers who are seen by sellers as being reasonably good substitutes." *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 641 (N.D. Ill. 2020) (cleaned up). Here, the State plausibly alleges that retail pharmacies have no reasonably good substitute buyers aside from PBMs, highlighting that pharmacies rely on PBM purchasers—which account for 80% of all prescription drug expenditures—to survive; that there are distinct prices for pharmacy services sold to PBMs as compared to cash-paying customers; and that Prime was able to significantly decrease reimbursement rates without causing pharmacies to leave Prime's network and switch to substitute buyers. AC ¶¶ 131, 133, 135. *See United States v. Bertelsmann*, 646 F. Supp. 3d 1, 34 (D.D.C. 2022) (noting "distinct prices" are practical indicia of an antitrust market, and that a market exists if buyers in that market could impose a price decrease without sellers turning to other buyers) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)).

The State defines the geographic scope of the market as the United States, or narrower markets therein, including the State of Michigan. AC ¶ 137.[10] To support

[9] Other than their meritless two-sided market arguments, *see infra* pp. 22-25, Defendants do not seem to challenge the State's product market definition, or that retail pharmacy services comprise a different market than mail-order pharmacy services.

[10] Defendants only challenge the State's broader geographic market—the United

its narrower geographic market definition, the State alleges that pharmacies can only do business with PBMs that are operational (and licensed) within the State of Michigan, so they cannot, in the face of decreased reimbursements, turn to out-of-state PBMs. *Id. See Delta Dental*, 484 F.Supp.3d at 641 (geographic scope of antitrust market in buyers' cartel case limited to those buyers who purchase services in geographic areas in which suppliers sell goods or services). Defendants claim that low barriers to entry defeat the State's narrower geographic market definition. *See* Mot. at 39. But the Sixth Circuit has warned courts against venturing into this type of fact-intensive inquiry at the motion-to-dismiss stage. *Foundation*, 244 F.3d at 531; *see also FTC v. Tenet Health Care*, 186 F.3d 1045, 1052 (8th Cir. 1999) ("The proper market definition can be determined only after a factual inquiry into . . . commercial realities . . . .").

*Market Power.* The State alleges Prime and ESI control at least 26% of the market nationally, and 89% in the smaller market of Michigan. AC ¶¶ 10, 139. Either is adequate at the pleading stage. If the court accepts Michigan as a relevant geographic market, an 89% market share is obviously more than the 30% Defendants

---

States—to the extent they lack market power nationwide. Mot. at 38. There is no dispute that the United States could serve as a proper geographic market if Michigan is defined too narrowly. *See SE Milk*, 739 F.3d at 277 ("a geographic market must be drawn to consist of the smallest area of overlap of Plaintiffs' and Defendants' locations, and in which prices could be increased without retailers turning to alternative suppliers or other [suppliers] entering the area.").

22

argue is necessary to demonstrate market power. Mot. at 39. But even in a national market, the State's allegations of at least 26% market share are sufficient. *See Valley Liquors v. Renfield Importers*, 822 F.2d 656, 667 (7th Cir. 1987) (17%); *Toys "R" Us v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (20% of national market and 49% of some local markets); *RealPage*, 709 F. Supp. 3d at 527 (less than 30% market share). Discovery will reveal the true nationwide market share of Defendants, if needed.

### c. *Ohio v. Amex* does not apply.

Defendants try to shoehorn the State's claims into the two-sided market framework of *Ohio v. American Express*, 585 U.S. 529 (2018) ("*Amex*"). Specifically, they claim the State needed to include allegations about the impact of the Agreement not only on pharmacies, but on "prescription drug costs for health plans," and failed to. Mot. at 36-38. However, this is not a two-sided market case.

Generally, antitrust cases focus solely on harms in the market affected by the restraint; in a cartel case, that would be the price effects experienced by direct purchasers (or buyers) of the cartel. *See Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019). In *Amex*, the Supreme Court held that for a narrow category of transactions— i.e., those occurring through a "two-sided transaction platform" like a credit card network—plaintiffs must also "demonstrate anticompetitive effects" on the "market as a whole." 585 U.S. at 547. "[T]wo-sided transaction platforms" are only those in which (1) each side of the platform engages in a "simultaneous transaction"; (2) the

23

two sides of the market "jointly consume a single product . . . transactions"; and (3) the platform exhibits "pronounced indirect network effects and interconnected pricing and demand." *Id.* at 545; *see In re NCAA Grant-In-Aid Cap Antitrust Litig.*, No. 14-md-02541, 2018 WL 4241981, at *4 (N.D. Cal. Sept. 3, 2018) (all three factors required for *Amex* to apply).

The State does not allege a two-sided transaction platform. First, pharmacy reimbursement transactions and payments from PBMs' payor clients do not occur "simultaneously." All the Complaint says about the timing of transactions is that some of the fees pharmacies pay for participation in PBM networks are "determined **after** the point of sale and assessed in an irrational or unreasonable manner." AC ¶ 63 (emphasis added). For the same reason, the second factor is not met either: PBMs are not operating a "transaction platform." Rather, on one "side" of the market, the PBM pays the pharmacy for dispensing prescription drugs, and on the other side, the insurer pays the PBM for adjudicating the payment and performing a host of other functions. *Id.* ¶¶ 56–60. The pharmacies and insurers are not, as in *Amex*, consuming "transactions" as a single product, as Defendants claim. Mot. at 36. *See Delta Dental*, 484 F. Supp. 3d at 637 (rejecting assertion that *Amex* applied simply because insurance companies play a role in "facilitating the care dentists provide patients"). Even if *Amex* were applicable, any assessment of effects on "both sides" of the market would be a fact- and expert-discovery-intensive question,

24

inappropriate for resolution at the Rule 12 stage. *See RealPage*, 709 F. Supp. 3d at 521; *Delta Dental*, 484 F. Supp. 3d at 640 ("No judgment can be made at this stage regarding the significance of any indirect network effects, which may or may not require a two-sided market analysis.").

### C.   The State Has Plausibly Alleged Parens Patriae Standing to Bring Its Antitrust Claims

#### 1.  The State has asserted a quasi-sovereign interest.

The Supreme Court has long recognized that a state has Article III standing to sue as parens patriae—literally, parent of the country—when it has a "quasi-sovereign interest" in the outcome of the controversy. *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) ("It has . . . become settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens."). What constitutes a "quasi-sovereign" interest has never been strictly defined, but it includes a state's concern for the "health and well-being—both physical and economic—of its residents in general," so long as the well-being of a "sufficiently substantial segment of its population" is at stake. *Alfred Snapp & Son v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Preventing antitrust harms to a state's citizenry has long been recognized as a quasi-sovereign interest. *See Georgia v. Penn. Railroad*, 324 U.S. 439, 450-51 (1945) (acknowledging Georgia's parens patriae standing to sue railroad companies for price-fixing).

25

The State has asserted a quasi-sovereign interest here. It alleges Prime and ESI—PBMs with significant market power within the State—have entered into an agreement to fix and suppress the prices they pay Michigan pharmacies. AC ¶¶ 88–100. This Agreement has injured virtually all of Michigan's pharmacies, which rely on payments from these PBMs to survive. *Id.* ¶¶ 7, 64–65. The payment of artificially low prices to Michigan pharmacies has, in turn, contributed to financial distress and pharmacy closures, and the proliferation of so-called "pharmacy deserts in the State." *Id.* ¶¶ 111–114, 120–125, 128. Not only have Michigan pharmacies (and their employees) been harmed, but so too have the economic and physical wellbeing of the State's citizenry. *Id*. ¶ 187 (noting impact pharmacy closures have on Michigan local economies). The State asserts that pharmacy closures have "decreased output, quality, and choice of pharmacy services for the People of the State of Michigan." *Id.* ¶ 144. It further asserts that the decrease in convenient access to quality pharmacy services has had "a direct negative impact on the health and wellbeing of the State's people." *Id.* ¶ 1; *id.* ¶ 20 (citing documented health effects of reduced pharmacy access).[11]

---

[11] The Court may also take judicial notice of the State's recent legislative efforts to combat abusive PBM practices. The Pharmacy Benefit Manager Licensure and Regulation Act of 2022 mandates, inter alia, that PBMs maintain "a reasonably adequate and accessible [brick-and-mortar] retail pharmacy benefit manager network" that provides "convenient . . . access to pharmacies within a reasonable distance from a [ patient's] residence." M.C.L. § 550.827. Such legislation demonstrates that this suit implicates a quasi-sovereign interest. *See Chapman v.*

Courts have routinely affirmed parens patriae standing in comparable antitrust actions. For example, in *New York v. Facebook*, the court found that the state-plaintiffs had properly asserted quasi-sovereign interests by alleging that Facebook's anticompetitive conduct (a) reduced the "quality and variety of privacy options" available to consumers in the relevant social media market; (b) harmed small and medium businesses reliant on social advertising; and (c) led "States' economies in general [to] suffer[] from suppressed innovation and investment" in the social media sector. 549 F. Supp. 3d 6, 23 (D.D.C. 2021), *aff'd*, 66 F.4th 288 (D.C. Cir. 2023). These same interests are present here.

Defendants claim that the State alleges only harm to pharmacies and not to a "sufficiently substantial segment of its population." Mot. at 14. Not so. As noted above, the State repeatedly asserts that the payment of below-market reimbursement rates has contributed to pharmacy closures, which in turn has caused broad-based harms to the State's citizens. The State need not, as Defendants suggest, "specify which costs have increased or by how much, or how many consumers have borne them" in the pleadings, Mot. at 14, as such matters plainly require discovery.

The State's well-pled allegations of statewide harm distinguish the instant

---

*Tristar Prods.*, 940 F.3d 299, 305 (6th Cir. 2019) ("In determining whether a sufficiently high proportion of the citizenry of a state face harm to their health and well-being to justify standing under *parens patriae*, the best indication is whether the State would, if it could, address the issue 'through its sovereign law-making powers.'") (citation omitted).

27

action from the cases cited by Defendants, all of which involved interests that were far narrower than those asserted here.[12] And the fact that many of the State's asserted injuries are downstream of harms suffered by pharmacies is of no moment, because the Supreme Court has long held the "indirect effects of the [alleged] injury" are critical to evaluating parens patriae standing. *Snapp*, 458 U.S. at 607. *See also Maryland v. Louisiana*, 451 U.S. 725, 737-39 (1981) (tax imposed on small subset of businesses implicated quasi-sovereign interest because—though consumers were not directly taxed—they were faced with increasing costs resulting from tax).

Defendants further claim that Michigan cannot have a quasi-sovereign interest because the alleged conspiracy impacts "pharmacies *everywhere*," not just in Michigan. *See* Mot. at 15. This argument is likewise unavailing. Courts are clear that parens patriae standing should not "be denied where the injury is felt by the citizens of the other states." *New York v. Microsoft*, 209 F. Supp. 2d 132, 151 (D.D.C. 2002).

**2. The State alleges a causal connection between the Agreement and harms to Michigan pharmacies and consumers.**

---

[12] *See Chapman*, 940 F.3d at 305 (rejecting Arizona's bid to challenge private class action settlement in single suit because it did not allege harms beyond the "class members in the lawsuit"); *In re Auto. Parts Antitrust Litig.*, No. 13-cv-2005, 2021 WL 148004, at *2-3 (E.D. Mich. Jan. 15, 2021) (Puerto Rico's complaint only described harm to citizens who purchased the "air flow meters that were at issue" and did not "contain 'specific allegations about the statewide magnitude'" of harms); *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652 (9th Cir. 2017) (California alleged only harm to egg farmers, rather than to health and welfare of broader population).

Article III standing requires a "causal connection between the injury and the conduct complained of." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The State alleges such a causal link here between (a) Defendants' alleged conspiracy to suppress payments to pharmacies, (b) underpayments to pharmacies, (c) pharmacies' resulting financial struggles and eventual closure, and (d) the loss of output, quality, and choice of pharmacy services for consumers. AC ¶¶ 18–21, 108–12, 122–28, 144; *see In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 997 (E.D. Mich. 2014) (plaintiffs plausibly allege causation by drawing a "traceable path" between defendants' misconduct and asserted harms). More detailed allegations of causation are not required at this stage. *See id.* at 998 (complexities in causation create "difficulties of proof, not pleading deficiencies").

Defendants' attempt to undermine the State's causation allegations by suggesting unspecified alternative causal explanations is unavailing. *See* Mot. at 15 A defendant's "antitrust violation need not be the sole cause of the [plaintiff's] alleged injuries," only a "material cause." *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 650 (E.D. Mich. 2000). For an "independent cause [to] break[] the causal connection" such that Rule 12 dismissal is warranted, "the alleged facts [must] show that the plaintiff's antitrust injury *inevitably* flows . . . from an independent cause *that fully accounts* for the plaintiff's injury." *Id.* at 651 (emphasis added). No such "alleged facts" exist here. *Id.*

29

### 3. Federal antitrust law authorizes states to pursue parens patriae actions for injunctive relief.

The only remedy the State seeks under federal antitrust law is injunctive relief. And "it is beyond dispute" that Section 16 of the Clayton Act, 15 U.S.C. § 26, permits a State to bring a parens patriae suit for injunctive relief for violations of federal antitrust law. *Microsoft*, 209 F. Supp. 2d at 150–51 (citing *Penn. R.R.*, 324 U.S. at 447). The State seeks monetary damages only under state law.

### 4. Michigan law authorizes the State to pursue damages for violations of the antitrust laws as parens patriae.

It is settled law that the Michigan Attorney General can "initiate actions" and "litigate on behalf of the people of the state," an authority rooted in statute and the common law.[13] *In re Certified Question from U.S. Dist. Ct. for E. Dist. of Michigan*, 465 Mich. 537, 544 (2002) (citing M.C.L. § 14.28, which authorizes the attorney general—"when in his own judgment the interests of the state require it"—to "appear for the people [] in any [] court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested"). This authority extends to actions seeking monetary damages for violations of state antitrust law on behalf of Michigan residents. *See Lumbermen's*, 1979 WL 18703, at *5-6 (state "may maintain a *parens patriae* [antitrust] suit for damages"). And while federal law limits

---

[13] Defendants concede that the Attorney General can seek "injunctive or other equitable relief and civil penalties." *See* Mot. at 22 (citing M.C.L. § 445.777).

parens patriae recovery for monetary damages to "natural persons," 15 U.S.C. § 15c, Michigan law contains no such limitation. *See* M.C.L. § 14.28. Rather, Michigan's Antitrust Reform Act ("MARA") defines "person" to include any "corporation, business trust, partnership, association, or any other legal entity," M.C.L. § 445.771, and it authorizes "any [such] person" to "bring an action for . . . damages." *Id.* § 445.778(2). Federal courts have thus repeatedly recognized the Michigan Attorney General's parens patriae authority to pursue and settle monetary damages claims under state antitrust law. *See FTC v. Mylan*, 62 F. Supp. 2d 25, 48 (D.D.C. 1999), *on reconsideration in part sub nom. FTC v. Mylan*, 99 F. Supp. 2d 1 (D.D.C. 1999) (denying motion to dismiss treble damages claims brought by Michigan AG as parens patriae under MARA); *In re Lorazepam Antitrust Litig.*, 205 F.R.D. 369, 386 (D.D.C. 2002) (approving *Mylan* settlement, and holding Michigan AG could "settle and release" state law antitrust damages claims under parens patriae authority); *In re Cardizem Antitrust*, 218 F.R.D. 508, 521 (E.D. Mich. 2003) (same).

Ignoring this well settled authority, Defendants assert that MARA does not ***specifically authorize*** parens patriae actions. Mot. at 11. But there is no need for MARA to grant this authority because the Attorney General ***already*** has such authority under Michigan law. *See* M.C.L. § 14.28. Indeed, any notion that "[Michigan's] antitrust laws [might] not authorize *parens patriae* damage actions" would inappropriately "overlook[] the fact that *parens patriae* actions are [also]

31

derived from the common law" and based on the State's "inherent power to protect its sovereign or quasi-sovereign interest." *Lumbermen's*, 1979 WL 18703, at *5-6 ("It is a matter of public policy to prosecute antitrust violators, and to compensate the public for damages sustained thereby."). Michigan's legislature enacted MARA against this well-established, common-law backdrop, and nothing in the text of MARA indicates it intended to disrupt the State's common law authority. *See Davis v. BetMGM, LLC*, 2025 WL 2054575, at *9 (Mich. July 22, 2025) ("We presume that the Legislature knows of the existence of the common law when it acts[, and] the Legislature should speak in no uncertain terms when it exercises its authority to modify the common law.") (cleaned up).

###    D.    The State Has Plausibly Alleged Antitrust Standing.

To maintain an antitrust suit, a plaintiff must establish antitrust standing, which is distinct from Article III standing. *See Assoc. Gen. Contractors of Cal. v. Cal. State Counc. of Carpenters*, 459 U.S. 519, 537–46 (1983) ("*AGC*"). To establish antitrust standing for an injunctive relief claim, a plaintiff must show that it has suffered an antitrust injury—that is, an "injury of the type the antitrust laws were intended to prevent," and also "that [the injury] flows from that which makes the defendants' acts unlawful." *Valley Prods. v. Landmark*, 128 F.3d 398, 402 (6th Cir. 1997). For a damages claim, a plaintiff must also show that it is "an efficient enforcer of the antitrust laws," *Mid-Michigan Radiology Assocs. v. Cent. Michigan*

*Cmty. Hosp.*, No. 94-cv-10057, 1995 WL 239360, at *3 n.4 (E.D. Mich. Feb. 14, 1995), which turns on "the directness and identifiability of the plaintiff's [antitrust] injury."[14] *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994). When courts consider whether antitrust standing exists in a parens patriae suit, they look to the party whose interests the State seeks to represent most directly and whether it would have antitrust standing. *See, e.g.*, *United States v. Live Nation Ent.*, No. 24-cv-3973, 2025 WL 835961, at *4 (S.D.N.Y. Mar. 14, 2025).

Here, the State seeks to represent the interests of Michigan pharmacies and consumers. The State alleges that Michigan pharmacies have received fixed, artificially suppressed reimbursement rates as a result of the Prime-ESI Agreement. AC ¶ 88–100. It also alleges that Michigan consumers have suffered a decrease in choice, access, output, and quality of pharmacy services as a result of Defendants' misconduct. *Id.* ¶¶ 13, 15, 18. These allegations are sufficient to establish antitrust standing for the State's damages and injunctive relief claims.

---

[14] To assess antitrust standing for damages claims, courts consider factors including "(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation." *Southaven Land Co. v. Malone & Hyde*, 715 F.2d 1079, 1085 (6th Cir. 1983) (citing *AGC*, 459 U.S. at 537–46).

33

The payment of below-market prices to suppliers pursuant to a horizontal agreement among buyers is one of the quintessential forms of antitrust injury. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 350b (Supp. 2024) ("When buyers agree illegally to pay suppliers less than the prices that would otherwise prevail, suppliers are obviously injured in fact. The suppliers' loss also constitutes antitrust injury, for it reflects the rationale for condemning buying cartels—namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices."); *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) (underpayment of reimbursement rates to medical provider pursuant to anticompetitive conspiracy constitutes antitrust injury). When this kind of paradigmatic antitrust injury is asserted, there is, by definition, a "direct link between [d]efendants' alleged antitrust violations," (i.e., their price fixing), "and [the plaintiff's] resulting harm" which "obviates the need for" further inquiry into the antitrust standing factors.[15] *GEICO v. Autoliv*, 345 F. Supp. 3d 799, 822 (E.D. Mich. 2018); *see also In re Cardizem Antitrust*, 332 F.3d 896, 911 (6th Cir. 2003) ("paying

---

[15] None of the cases cited by Defendants involved a plaintiff who alleged direct payment or receipt of a fixed price. *See Static Control Components v. Lexmark*, 697 F.3d 387, 406 (6th Cir. 2012), *aff'd*, 572 U.S. 118 (2014) (indirect purchasers lacked antitrust standing because "existence of . . . [more] direct victims increase[ed] the danger of duplicative recovery"); *Bodie-Rickett v. Mar*, 957 F.2d 287, 292 (6th Cir. 1992) ("indirect injuries" could "render damages highly speculative") (citation omitted); *Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*, 155 F.4th 795, 814-815 (6th Cir. 2025) (no antitrust standing for indirect seller).

higher prices for a product due to a lack of competition" is sufficient to establish antitrust standing). It is thus black-letter law that in a buyers' cartel case, sellers to the cartel (here, pharmacies) have antitrust standing to pursue under-payment damages. *Omnicare*, 524 F. Supp. 2d at 1040 ("In a buyers' conspiracy case, a seller sufficiently alleges antitrust injury [and standing] by pleading that it has received excessively low prices from members of the buyers' cartel.").

The State alleges precisely this form of paradigmatic antitrust injury—that Michigan pharmacies, which supply goods and services that Defendants purchase, received fixed, artificially suppressed prices from Defendants as a result of their unlawful agreement. AC ¶ 93. This is sufficient to establish antitrust standing for both damages and injunctive relief claims, as Defendants concede. *See* Mot. at 21 (acknowledging "pharmacies would have the ability to assert" the antitrust claims alleged by the State here based on the "direct [underpayment] injuries they may have suffered"). Because the State is standing in the shoes of Michigan pharmacies here, antitrust standing exists. *Live Nation*, 2025 WL 835961, at *4.

Defendants nevertheless complain that the State does not allege a direct "causal connection" between consumers' alleged antitrust injuries and Defendant's alleged conspiracy. Mot. at 20. Even if this were true (and it is not, *see supra* p. 29), it would not matter: As indicated above, the State has standing to pursue both damages and injunctive relief claims for violations of the antitrust laws on the basis

35

of injuries sustained by Michigan pharmacies alone.

### E. The State Has Plausibly Alleged a Common Law Public Nuisance.

Under Michigan law, a public nuisance exists where there is "an unreasonable interference with a common right enjoyed by the general public." *Cloverleaf Car Co. v. Phillips Petroleum*, 213 Mich. App. 186, 190 (1995). Such interference is established when conduct: "(1) significantly interferes with the public's health, safety, peace, comfort, or convenience, (2) is proscribed by law, or (3) is known or should have been known by the actor to be of a continuing nature that produces a permanent or long-lasting, significant effect on these rights." *Id.*

The Complaint pleads facts satisfying all three definitions. ***First***, the State alleges that Defendants' conduct "involves a significant interference with the public health [and] the public safety." AC ¶ 191(a). Specifically, Defendants intentionally drove retail pharmacies out of business through anticompetitive practices, including suppressing compensation rates for Michigan pharmacies and steering patients to Defendants' mail-order pharmacies. *Id.* ¶ 184. These practices contributed to widespread pharmacy closures, depriving Michigan residents of convenient access to essential medications and healthcare services and directly endangering public health and safety. *Id.* ¶¶ 185–87. ***Second***, the State alleges Defendants' conduct is proscribed by state and federal laws, including the Sherman Act and MARA. *Id.* ¶¶ 164–81. ***Third***, the State alleges that Defendants' conduct is of a continuing

36

nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health and the public safety. *Id.* ¶¶ 184–88. Specifically, Defendants knew or should have known that their behavior would result in the closure of Michigan retail pharmacies, *id.* ¶ 189, and that pharmacy deserts are not temporary disruptions, they are enduring harms that permanently impair access to healthcare. *Id.* ¶¶ 46, 53.

Defendants' only response—that public nuisance must stem from land use—is meritless. Michigan law imposes no such requirement. To the contrary, Michigan courts have made clear while "***private*** nuisance is related to the use of land[,] . . . ***public nuisance*** is not similarly limited." *Mayor of Detroit v. Arms Tech.*, 258 Mich. App. 48, 52, 55 (2003) (emphasis added); *Hadid v. Hartman*, No. 205799, 1999 WL 33453817, at *3 (Mich. Ct. App. Mar. 5, 1999) (recognizing public nuisance claim where "plaintiff assert[ed] no invasion of his rights in land"). The cases Defendants cite merely involved land-based nuisances; they do not establish that a connection to land is required. *See* Mot. at 41 (citing, *e.g.*, *State v. McQueen*, 811 N.W.2d 513, 530-531 (2011) (defining public nuisance without any reference to land)). Nor does it matter that the courts of other states have taken different approaches—Michigan law governs here. In any event, the community harm here does stem from land and property use: the abandonment of brick-and-mortar pharmacies.

**F.     The State Has Plausibly Alleged a Statutory Public Nuisance.**

37

By pleading the elements of common law public nuisance, the State has also properly pled its statutory public nuisance claim under M.C.L. § 600.3801(3), which unambiguously provides that "[a]ll . . . nuisances shall be enjoined and abated as provided in this act and the court rules." Defendants attempt to limit subsection (3) to the specific examples enumerated in subsections (1) and (2): prostitution, gambling, and illicit intoxicants. Mot. at 40–41. But this defies the provision's unambiguous plain text, which must be given effect. *DiBenedetto v. W. Shore Hosp.*, 461 Mich. 394, 402 (2000) (Michigan courts interpret statutes by "examining" their "plain language" and giving words "their plain and ordinary meaning"). Had the Legislature intended to limit subsection (3)'s remedial scope to only those nuisances described in the preceding subsections, it would have employed limiting language like "such nuisances" or "the foregoing nuisances." But it did not. The Legislature instead chose the expansive term "all"—and this language is dispositive. *See People v. Monaco*, 474 Mich. 48, 50 (2006) ("The word 'all' leaves no room for exceptions or restrictions.") (cleaned up). Defendants' reliance on *State ex rel. Oakland Prosecuting Attorney v. Ginell*, 407 N.W.2d 59, 60 (Mich. Ct. App. 1987), is misplaced. *Ginell* merely addressed whether specific conduct fell within subsections (1) and (2); it did not hold or even suggest that M.C.L. § 600.3801 provides no remedy for public nuisances beyond those specified examples. *Id.* (allegations of "indecent or obscene conduct" at adult book and video store did not constitute

"prostitution" within meaning of M.C.L. § 600.3801(1)).

### G.  The State Has Plausibly Alleged Unjust Enrichment.

Unjust enrichment occurs where a party "unjustly retains . . . money or benefits which in justice and equity belong to another." *Tkachik v. Mandeville*, 487 Mich. 38, 47–48 (2010) (cleaned up). The elements are "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Belle Isle Grill v. Detroit*, 256 Mich. App. 463, 478 (2003). The State alleges both: Defendants have received a monetary benefit—artificially inflated fees extracted from Michigan pharmacies, AC ¶¶ 13, 93, 99, 204—resulting in inequity to pharmacies. *Id.* ¶¶ 203, 205. And courts regularly sustain unjust enrichment claims when conduct overlaps antitrust claims. *See, e.g.*, *Cardizem*, 105 F. Supp. 2d at 668-69 (unjust enrichment properly pled under where defendant's monetary benefits flowed from their antitrust conspiracy); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544-46 (D.N.J. 2004) (same).

Defendants are incorrect that their "express written contracts with Michigan pharmacies foreclose the State's unjust enrichment claim." Mot. at 42. The State alleges that Defendants' misconduct occurs entirely *outside* the "original contract[s]" they signed with pharmacies. *Cascade Elec. Co. v. Rice*, 70 Mich. App. 420, 426 (1976). For example, the State alleges Prime substituted its existing "contractual incentive program" for network pharmacies with ESI's fee program,

39

"subject[ing] non-affiliated pharmacies to contractual terms that belonged to [ESI]," including higher fees. AC ¶ 99. Claims of unjust enrichment can prevail where, as here, "recovery is sought for items not contemplated in the original contract." *Cascade*, 70 Mich. App. at 426. In any event, this question is premature. "[U]njust enrichment claims routinely are allowed to proceed when pleaded in the alternative to other viable claims for relief." *Francis v. Gen. Motors*, 504 F. Supp. 3d 659, 694 (E.D. Mich. 2020) ("alternative pleading . . . particularly is appropriate[] where the defendant explicitly disclaims the availability of a contractual remedy").[16]

## H. The State's Claims Are Timely.

The State's claims are timely under two independent doctrines: *First*, the State pleads a continuing violation of the antitrust laws because each reimbursement to a pharmacy pursuant to the Prime-ESI Agreement constituted a new "overt act" in furtherance of the conspiracy, and the statute of limitations began running again with each reimbursement. *Ford*, 2024 WL 1396264, at *8. *Second*, the State pleads specific facts demonstrating Prime and ESI fraudulently concealed their conspiracy, delaying the running of the statute of limitations until the State should have known of its claims. A motion dismiss is typically "an inappropriate vehicle for dismissing

---

[16] The cases Defendants cite were significantly more procedurally advanced. *See Wausau Underwriters v. Vulcan*, No. 00-cv-70879, 2001 WL 34089607 (E.D. Mich. Apr. 16, 2001), *aff'd*, 323 F.3d 396 (6th Cir. 2003) (dismissing unjust enrichment claim at summary judgment); *Belle Isle*, 256 Mich. App. at 472 (same).

40

a claim based upon the statute of limitations," *Jodway v. Orlans*, 759 F. App'x 374, 379 (6th Cir. 2018), and fraudulent concealment is usually a question "for the jury." *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1018 (E.D. Mich. 2010).

### 1. Each reimbursement made pursuant to the Agreement constitutes an overt act sufficient to continue the statute of limitations.

For an antitrust claim, a new cause of action "accrues each time a plaintiff is injured by an act of the defendants." *Ford*, 2024 WL 1396264, at *8 (quoting *Barnosky Oils v. Union Oil*, 665 F.2d 74, 82 (6th Cir. 1981)). For Section 1 claims, each sale or purchase of a price-fixed product constitutes a continuing violation. *Klehr v. A.O. Smith*, 521 U.S. 179, 189 (1997); *accord In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) ("*Klehr* simply reiterates that the antitrust laws recognize continuing violations and, more precisely, that a new § 1 claim arises each time a company sells a price-fixed product."). Defendants mistakenly rely on authority applying the continuing violations doctrine to monopolization and other unilateral conduct claims brought under Section 2. *See* Mot. at 27.[17] For monopolization claims, violations are not considered "continuing"

---

[17] *See DXS v. Siemens Med. Sys.*, 100 F.3d 462, 466 (6th Cir. 1996) (no continuing violation for alleged monopolization); *Z Techs. v. Lubrizol*, 753 F.3d 594, 595 (6th Cir. 2014) (purchases following merger not continuing violations). *Brave Optical v. Luxottica*, No. 23-cv-793, 2025 WL 962827 (S.D. Oh. Mar. 31, 2025), is out of step with black-letter law, as it incorrectly imported the continuing-violation analysis from cases involving monopolization to a price-fixing case. But the plaintiffs there distinguished between unilateral conduct and price-fixing claims, as the State does

if they merely reflect the continuing consequences of a prior monopolistic scheme, including the payment of inflated prices. *DXS*, 100 F.3d at 466. But for Section 1 price-fixing claims, courts have held with near uniformity that each purchase or sale is an "overt act." *E.g.*, *Klehr*, 521 U.S. at 189; *Connecticut v. Sandoz, Inc.*, No. 3:20-cv-00802, 2025 WL 3043397, at *40 (D. Conn. Oct. 31, 2025) (under Michigan antitrust law—as with federal law—a claim accrues with "each [new] sale at a conspiracy-driven price"); *id.* at *8-9 (citing cases). Thus, each reimbursement paid to a pharmacy at a reduced rate pursuant to Defendants' price-fixing agreement constituted an overt act sufficient to continue the statute of limitations. *Id*.

### 2. The State plausibly alleges fraudulent concealment.

To allege fraudulent concealment, a plaintiff must plead: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).

**Concealment.** Any affirmative act that maintains the secrecy of an antitrust conspiracy is a "wrongful concealment." *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 1006 (N.D. Oh. 2015) (price-increase announcements that

---

here. *See* Opp. to MTD, *Brave Optical*, No. 23-cv-00793, ECF No. 25 at *8-10 (April 2, 2024). Had the court been given the benefit of these arguments, it may have decided the case differently.

failed to mention conspiracy as reason for rising costs were "affirmative acts of concealment"); *see also Pinney Dock v. Penn Cent.*, 838 F.2d 1445, 1466-67 (6th Cir. 1988). Defendants claim the State should have known about its claims when Defendants publicly announced their partnership in 2019. Mot. at 26. But this fails to account for Defendants' alleged secretive conduct: ESI and Prime made false and misleading statements about their arrangement, including that it reflected lawful "collaboration" and that their reimbursement rates were set competitively, when in fact, they were set pursuant to a collusive agreement. AC ¶¶ 146-147, 149-50. ESI's public code of conduct also prohibited employees from working for a competitor and required compliance with antitrust laws. *Id.* ¶ 150. The State also alleges Defendants shared their pricing data through an offshore GPO, that executives from both companies attended invitation-only events which provided an opportunity to conspire, and that private details of the agreement were discussed behind closed doors. *Id*. ¶¶ 153-55. Defendants' failure to disclose the true nature of their Agreement when they publicly announced it, together with their affirmative statements that their reimbursement rates were set competitively, sufficed to "foster a misrepresentation" about compliance with the law. *See Papa John's*, 2019 WL 5386484, at *10 (statements that franchisee had complete control over hiring "fostered a misimpression" that franchisor was not enforcing no-poach agreement); *Phhhoto v. Meta*, 123 F. 4th 592, 604-06 (2d Cir. 2024) (press releases with material

43

omissions constituted an "affirmative step" of concealment, not mere "silence.").

**Due Diligence**. Where fraudulent concealment is alleged, courts dismiss complaints as untimely for lack of due diligence "only if it is obvious from the complaint that the plaintiff conducted absolutely no investigation," when it had a reason to do so. *In re Auto. Parts Antitrust*, No. 12-md-02311, 2013 WL 2456584, at *13 (E.D. Mich. June 6, 2013) (quoting *Duncan v. Leeds*, 742 F.2d 989, 993 (6th Cir. 1984)). The duty to investigate is triggered only when it has reason to suspect that "wrongdoing is afoot." *See Polyurethane*, 152 F. Supp. 3d at 1006-07.

Here, Defendants took pains to maintain the confidentiality of their Agreement—and publicly mischaracterized it as reflecting lawful collaboration. AC ¶ 153. As a result, the State did not have reason to investigate Defendants' wrongdoing (or the State's resulting legal claims) until at least January 17, 2025, when the final order on the merits of the AHF arbitration became public and revealed specific anticompetitive features of the Agreement. *Id.* ¶ 159. Whether other lawsuits concerning the Agreement may have been filed previously is immaterial: The State had no reason to peruse public filings nationwide to alert itself to a possible conspiracy in order to exercise "due diligence." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 555 (4th Cir. 2019) ("filing of similar lawsuits against the same defendant" did not "defeat a fraudulent-concealment claim").[18] It was therefore reasonable for

---

[18] *See also Ruth v. Unifund*, 604 F.3d 908, 911 (6th Cir. 2010) ("mere availability of

the State's interest in Defendants' conduct to be piqued only when the final order in AHF issued, and then, the State began the investigation giving rise to this Complaint.

## I.   Evernorth Is a Proper Defendant.

Defendants' argument that Evernorth Health, Inc. is not a proper defendant, Mot. at 43-44, ignores the State's allegations that Evernorth "owns Express Scripts and actively participates in the unlawful conduct alleged . . . by shaping [the relevant ESI] policies . . . and participating in the development, approval, and implementation of Defendants' unlawful conduct." AC ¶ 26. The State also alleges Evernorth "executives are directly involved in major strategic decisions concerning [ESI], including those involving ESI's partnerships with other PBMs" such as Prime, *id*. ¶ 27, and that ESI's CEO has attributed its successes in cost containment to "#TeamEvernorth," *id*. ¶ 28. These allegations are sufficient to establish Evernorth as a proper defendant. *See Sun Microsys. v. Hynix*, 622 F. Supp. 2d 890, 901-02 (N.D. Cal. 2009) (parent may liable for antitrust violations of subsidiary if it participated in conspiracy).

## V.   <u>CONCLUSION</u>

Defendants' motion to dismiss the Complaint should be denied.

---

open and readily accessible public records" does not trigger duty to investigate if plaintiff does not have "ample reason" to look at them); *Papa John's*, 2019 WL 5386484, at *11 (no lack of due diligence where franchise agreement with anticompetitive terms was publicly available because facts did not "exist . . . to conclude that a reasonable person's interest would be piqued").

Respectfully submitted,

*/s/ Natasha J. Fernández-Silber*
Natasha J. Fernández-Silber* (P83334)
**EDELSON PC**
200 South 1st Street
Ann Arbor, MI 48104
Tel: (312) 589-6370
Fax: (312) 589-6378
nfernandezsilber@edelson.com
*Admitted in New York and Michigan only

*Special Acting Attorney General*
*for the State of Michigan*

*/s/ Jonathan S. Comish*
Jonathan S. Comish (P86211)
Assistant Attorney General
**Michigan Department of Attorney General**
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
Tel: (517) 335-7632
comishj@michigan.gov

*Assistant Attorney General*
*for the State of Michigan*

46